[Cite as *State ex rel. Toledo Blade Co. v. Toledo-Lucas Cty. Port Auth.*, 121 Ohio St.3d 537, 2009-Ohio-1767.]

THE STATE EX REL. TOLEDO BLADE COMPANY *v.*

TOLEDO-LUCAS COUNTY PORT AUTHORITY.

[Cite as *State ex rel. Toledo Blade Co. v. Toledo-Lucas Cty. Port Auth.*,

**121 Ohio St.3d 537, 2009-Ohio-1767.]**

*Public records — Proof that records have already been provided — Application*

*of attorney-client privilege to investigative report prepared by attorney.*

(No. 2008-1570 ─ Submitted March 10, 2009 ─ Decided April 21, 2009.)

IN MANDAMUS.

_____

**Per Curiam.**

{¶ 1}  This is an original action for a writ of mandamus to compel a port authority to provide access to both an investigative report prepared by a law firm on behalf of the port authority and the associated documentation reviewed by the attorneys to prepare the report. Because the report is excepted from disclosure under the Public Records Act by the attorney-client privilege, and the port authority has already provided access to the requested additional documentation, we deny the writ.

**Investigation and Termination**

{¶ 2}  Respondent, the Toledo-Lucas County Port Authority, is a political subdivision of the state of Ohio that was created in 1955 and operates under R.C. Chapter 4582. Spengler Nathanson, P.L.L., is a Toledo law firm that has a long history of representing the port authority in various legal matters.

{¶ 3}  Beginning in 2001, the port authority joined with several other northwest Ohio governmental entities in a consortium to request federal funds. From 2002 through 2007, the consortium contracted first with a lobbying firm with which Kathy Teigland was associated and then with Teigland herself to act

as a lobbyist for the consortium. During this period, the port authority employed James Hartung as its president. In addition, Hartung served as administrator of the consortium beginning in 2006.

{¶ 4}   In July 2008, the mayor of the city of Toledo, a consortium member, informed the port authority that Hartung had been engaged in an extramarital affair with the lobbyist and that Hartung may have improperly funneled money to the lobbyist and used his influence to her advantage. The port authority contracted with attorney Teresa Grigsby of the Spengler Nathanson law firm to investigate the factual and legal issues concerning the mayor's allegations. The port authority considered it essential that its long-time outside counsel conduct the investigation to identify the pertinent factual and legal issues. The chairman of the port authority anticipated that some port authority staff might be reluctant to speak openly and candidly unless the confidentiality of the investigation could be ensured.

{¶ 5}   Spengler Nathanson, through attorney Grigsby and other attorneys, reviewed and analyzed port authority records and prepared an investigative report. The attorneys distributed numbered copies of the investigative report in sealed envelopes to the members of the port authority's board of directors during an executive session of a regularly scheduled meeting. The board members were informed that the report was confidential and could not be shown or disclosed to any third party. Following a subsequent special session, copies of the report were returned to the law firm.

{¶ 6}   On August 1, 2008, after the special meeting, the board voted unanimously to terminate Hartung's employment with the port authority immediately and for cause. The port authority publicly announced that Hartung had been terminated because he had pursued an inappropriate relationship with a vendor to the consortium in violation of the port authority's policies.

### Records Requests and Mandamus Case

{¶ 7} Relator, the Toledo Blade Company ("the Blade"), is an operating division of Block Communications, Inc., a corporation that publishes a newspaper of general circulation. On August 1, 2008, the Blade requested that the port authority provide it with copies of the investigative report and the associated documentation. After the port authority refused the Blade's request based on attorney-client privilege, the Blade submitted a second request. The port authority ultimately made available to the Blade all of the responsive documents that the attorneys had reviewed in preparing the investigative report.

{¶ 8} The Blade filed this action for a writ of mandamus to provide access to the report and supporting records under R.C. 149.43, the Ohio Public Records Act. The Blade also requested statutory damages and attorney fees. After the port authority filed an answer, we granted an alternative writ and ordered the port authority to submit a copy of the investigative report under seal.

{¶ 9} This cause is now before this court for our determination of the merits.

### Mandamus in Public-Records Cases

{¶ 10} "Mandamus is the appropriate remedy to compel compliance with R.C. 149.43, Ohio's Public Records Act." *State ex rel. Physicians Commt. for Responsible Medicine v. Ohio State Univ. Bd. of Trustees*, 108 Ohio St.3d 288, 2006-Ohio-903, 843 N.E.2d 174, ¶ 6; R.C. 149.43. In resolving public-records mandamus claims, "we construe R.C. 149.43 liberally in favor of broad access and resolve any doubt in favor of disclosure of public records." *State ex rel. Glasgow v. Jones*, 119 Ohio St.3d 391, 2008-Ohio-4788, 894 N.E.2d 686, ¶ 13.

{¶ 11} Respondent, Toledo-Lucas County Port Authority, is a political subdivision of the state of Ohio created under R.C. Chapter 4582. See R.C. 4582.22(A) ("A port authority created pursuant to this section is a body corporate and politic * * *. The exercise by such port authority of the powers conferred upon it shall be deemed to be essential governmental functions of the state * *

*"); see also 1994 Ohio Atty.Gen.Ops. No. 94-020 (port authority is itself a political subdivision). A "public office" for purposes of the Public Records Act "includes any * * * political subdivision * * * established by the laws of this state for the exercise of any function of government." R.C. 149.011(A). Therefore, the port authority is a public office subject to R.C. 149.43.

{¶ 12} In addition, the requested records are records generally subject to R.C. 149.43. Under R.C. 149.011(G), records are subject to the Public Records Act if they are documents created or received by the public office that "serve to document the organization, functions, policies, decisions, procedures, operations, or other activities of the office." The port authority received its attorney's investigative report and has custody of the records that the attorney reviewed in the investigation, and these records document the port authority's decisions and actions.

{¶ 13} Therefore, unless the requested records have either already been provided to the Blade or are excepted from disclosure, the Blade would be entitled to disclosure of the records under R.C. 149.43.

### Documentation Associated with the Investigative Report

{¶ 14} The Blade is not entitled to a writ compelling disclosure of the requested documentation associated with the investigative report, because the evidence is uncontroverted that it has received this documentation. In general, providing the requested records to the relator in a public-records mandamus case renders the mandamus claim moot. *State ex rel. Toledo Blade Co. v. Ohio Bur. of Workers' Comp.*, 106 Ohio St.3d 113, 2005-Ohio-6549, 832 N.E.2d 711, ¶ 16.

{¶ 15} Although the Blade is correct in stating that a respondent in a public-records case must establish that it has provided the requested records to moot the mandamus claim, see *State ex rel. Cincinnati Enquirer v. Dupuis*, 98 Ohio St.3d 126, 2002-Ohio-7041, 781 N.E.2d 163, ¶ 9, the port authority has met its burden here with the affidavit of its board of directors chairman, William J.

Carroll, specifying that "all Port Authority documents which the attorneys reviewed and considered in connection with the underlying investigation, including resolutions, contracts, invoices, financial records, correspondence, and the e-mails, were made available to the Blade." The Blade's reliance on *Dupuis*, in which the public-records custodians offered no proof that they had provided the record "aside from the bare unverified assertions in their merit brief," is thus misplaced. Id. at ¶ 9.

{¶ 16} Therefore, the Blade's claim for the records associated with the investigative report is denied based on mootness. The Blade's claim for the requested investigative report remains.

### Exceptions to Disclosure: In General

{¶ 17} "Exceptions to disclosure under the Public Records Act, R.C. 149.43, are strictly construed against the public-records custodian, and the custodian has the burden to establish the applicability of an exception. A custodian does not meet this burden if it has not proven that the requested records fall squarely within the exception." *State ex rel. Cincinnati Enquirer v. Jones-Kelley*, 118 Ohio St.3d 81, 2008-Ohio-1770, 886 N.E.2d 206, paragraph two of the syllabus.

{¶ 18} The port authority asserts in its answer that the Blade is not entitled to inspect and copy the investigative report because the report is excepted from disclosure under the attorney-client privilege and the work-product privilege.

### Work Product

{¶ 19} The port authority has not established that the investigative report is excepted from disclosure as work product. In its merit brief, the port authority appears to have abandoned reliance on this exception by stating that "the separate legal issue of whether the report also constitutes privileged attorney work product need not be resolved." Therefore, we will not address this exception. See *Glasgow*, 119 Ohio St.3d 391, 2008-Ohio-4788, 894 N.E.2d 686, ¶ 26 (the court

did not address a public-records request, because the relator failed to specifically argue it in the merit brief).

**Attorney-Client Privilege**

{¶ 20} The primary issue in this case is whether the attorney-client privilege excepts from disclosure under R.C. 149.43 the investigative report prepared by the port authority's outside counsel.

{¶ 21} "The attorney-client privilege is one of the oldest recognized privileges for confidential communications." *Swidler & Berlin v. United States* (1998), 524 U.S. 399, 403, 118 S.Ct. 2081, 141 L.Ed.2d 379. "The privilege is intended to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.' " Id. at 403, quoting *Upjohn Co. v. United States* (1981), 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584. "In modern law, the privilege is founded on the premise that confidences shared in the attorney-client relationship are to remain confidential." *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 660, 635 N.E.2d 331.

{¶ 22} R.C. 149.43(A)(1)(v) excepts "[r]ecords the release of which is prohibited by state or federal law" from the definition of "public record." "The attorney-client privilege, which covers records of communications between attorneys and their government clients pertaining to the attorneys' legal advice, is a state law prohibiting release of these records." *State ex rel. Besser v. Ohio State Univ.* (2000), 87 Ohio St.3d 535, 542, 721 N.E.2d 1044; *State ex rel. Nix. v. Cleveland* (1998), 83 Ohio St.3d 379, 383, 700 N.E.2d 12.

{¶ 23} The Blade asserts that the factual portions of the investigative report are not covered by the attorney-client privilege, because they do not constitute legal advice. The Blade claims that in this regard, R.C. 2317.02(A)(1) refutes the port authority's contention that the factual recitals contained in this investigative report are privileged. The Blade also cites *State v. Kemper*, 158

Ohio App.3d 185, 2004-Ohio-4050, 814 N.E.2d 540, in support of its claim. In *Kemper*, the appellate court held that testimony by a criminal defendant's former attorney that she forwarded notice of a hearing to the defendant was not within the scope of the R.C. 2317.02 attorney-client privilege.

{¶ 24} The Blade's argument lacks merit. "In Ohio, the attorney-client privilege is governed by statute, R.C. 2317.02(A), and in cases that are not addressed in R.C. 2317.02(A), by common law." *State ex rel. Leslie v. Ohio Hous. Fin. Agency*, 105 Ohio St.3d 261, 2005-Ohio-1508, 824 N.E.2d 990, ¶ 18. "R.C. 2317.02(A), by its very terms, is a mere testimonial privilege precluding an attorney from testifying about confidential communications. The common-law attorney-client privilege, however, 'reaches far beyond a proscription against testimonial speech. The privilege protects against any dissemination of information obtained in the confidential relationship.' " Id. at ¶ 26, quoting *Am. Motors Corp. v. Huffstutler* (1991), 61 Ohio St.3d 343, 348, 575 N.E.2d 116.

{¶ 25} In fact, most courts that have expressly addressed the issue of whether an attorney's factual investigations are covered by the attorney-client privilege have determined that such investigations may be privileged. See, e.g., *In re Allen* (C.A.4, 1997), 106 F.3d 582, 602, and cases cited therein. For example, in *Upjohn*, 449 U.S. at 390-391, 101 S.Ct. 677, 66 L.Ed.2d 584, the United States Supreme Court recognized that the "first step in the resolution of any legal problem is ascertaining the factual background and sifting through facts with an eye to the legally relevant." "[T]he *Upjohn* pronouncement hardly stands alone. Courts have consistently recognized that investigation may be an important part of an attorney's legal services to a client." See *In re Allen*, 106 F.3d at 602, and cases cited therein.

{¶ 26} Notwithstanding the Blade's argument to the contrary, "the privilege is not narrowly confined to the repetition of confidences that were supplied to the lawyer by the client. That cramped view of the attorney-client

privilege is at odds with the underlying policy of encouraging open communication; it poses inordinate practical difficulties in making surgical separations so as not to risk revealing client confidences; and it denies that an attorney can have *any* role in fact-gathering incident to the rendition of legal advice and services." (Citations omitted; emphasis sic.) *Spectrum Sys. Internatl. Corp. v. Chem. Bank* (1991), 78 N.Y.2d 371, 379, 575 N.Y.S.2d 809, 581 N.E.2d 1055.

**{¶ 27}** "The relevant question is not whether [an attorney] was retained to conduct an investigation, but rather, whether this investigation was 'related to the rendition of legal services.' " *In re Allen*, 106 F.3d at 603, quoting *Dunn v. State Farm Fire & Cas. Co.* (C.A.5, 1991), 927 F.2d 869, 875. The attorney-client privilege "does not require the communication to contain purely legal analysis or advice to be privileged. Instead, if a communication between a lawyer and client would facilitate the rendition of legal services or advice, the communication is privileged." *Dunn*, 927 F.2d at 875. "The fact that the task performed could have been accomplished as easily by a nonlawyer, does not necessarily mean that the privilege will not apply." 1 Rice, Attorney-Client Privilege in the United States (2d Ed.1999) 67, Section 7:9.

**{¶ 28}** The applicable test espoused by these authorities does not differ much from the test the court set forth for client communications to attorneys in *Leslie*, 105 Ohio St.3d 261, 2005-Ohio-1508, 824 N.E.2d 990, at ¶ 29: "The [attorney-client] privilege applies when legal advice of any kind is sought from the legal advisor in that capacity and the client's confidential communication relates to that purpose." "Before the attorney-client privilege applies to communications relating to investigative services, the client for whom the investigation was conducted must show that other *legal* advice or assistance was sought and that the investigation conducted was integral to that assistance."

(Emphasis sic.) 1 Rice, Attorney-Client Privilege in the United States, at 76, Section 7:16.

{¶ 29} After applying this test to the facts here, we conclude that the factual investigation conducted by attorney Grigsby was incident to or related to any legal advice that the attorneys hired by the port authority would give concerning the mayor's allegations of misconduct by the port authority president. More specifically, the attorney's investigation required her to draw upon her legal training and experience as well as her knowledge of the law governing the port authority and its policies and personnel. Both the port authority and its outside counsel knew that the investigation was replete with various legal issues and consequences that would be better resolved by the port authority's employing its long-time attorney to conduct the investigation and prepare the report. Legal issues included interpretation of Hartung's employment contract, an analysis of ethics law and criminal law, potential tort claims by Hartung and Teigland, and the construction of a confidentiality provision in the settlement agreement concerning a previous port authority investigation. Legal analysis related to the facts in the investigation is integrated throughout the report.

{¶ 30} In this regard, although the sealed report did not make a specific recommendation regarding the ultimate outcome of Hartung's employment with the port authority, the mere fact that an attorney's investigative report is inconclusive or intended for future discussion or action is "without significance." *Spectrum Sys.*, 78 N.Y.2d at 380, 575 N.Y.S.2d 809, 581 N.E.2d 1055. As the Court of Appeals for New York reasoned in *Spectrum Sys.*:

{¶ 31} "Legal advice often begins—and may end—with a preliminary evaluation and a range of options. More than that may not be possible upon an initial investigation. Similarly, the absence of legal research in an attorney's communication is not determinative of privilege, so long as the communication reflects the attorney's professional skills and judgments. Legal advice may be

grounded in experience as well as research." (Citation omitted.) Id. Accord *State ex rel. Alley v. Couchois* (Sept. 20, 1995), Miami App. No. 94-CA-30, 1995 WL 559973.

{¶ 32} The Blade cites a treatise that criticizes this approach,[1] but courts have rejected the treatise's view. See, e.g., *United States v. Rowe* (C.A.9, 1996), 96 F.3d 1294, 1296 ("Although some commentators, including Wright & Graham, continue to distinguish between fact-finding and lawyering, federal judges cannot" because of the United States Supreme Court's decision in *Upjohn* [footnote omitted]).

{¶ 33} Therefore, based on the persuasive weight of authority, we hold that the port authority has established that the investigative report was related to attorney Grigsby's rendition of legal services and is thus excepted from disclosure under the Public Records Act as material covered by the attorney-client privilege. This holding "furthers the laudatory objectives of the privilege: complete and candid communication between attorneys and clients." *Leslie*, 105 Ohio St.3d 261, 2005-Ohio-1508, 824 N.E.2d 990, ¶ 43. As the uncontroverted evidence established, because port authority staff members knew that Grigsby was an attorney, they felt free to speak openly and candidly and with the understanding that their comments and the investigation were serious legal matters that could carry serious legal consequences. Nor did the withholding of this privileged report significantly deter the Blade's reporting on the matter. The port authority responded to 18 public-records requests by the Blade from mid-July 2008 until early August 2008 by making available to the Blade thousands of documents, including all public records reviewed by the attorneys in connection with the

---

1. See 24 Wright & Graham, Federal Practice and Procedure (1986) 229, Section 5478 ("The better view would seem to be that investigative work is not 'professional legal services' and that no privilege applies where the lawyer's primary function is as a detective").

preparation of the investigative report. The Blade reported extensively about the matter.

{¶ 34} Based on the foregoing, we deny the writ of mandamus.

## Statutory Damages and Attorney Fees

{¶ 35} Because the Blade's mandamus claim lacks merit, we deny its request for statutory damages and attorney fees. R.C. 149.43(C); cf. *Glasgow*, 119 Ohio St.3d 391, 2008-Ohio-4788, 894 N.E.2d 686, ¶ 30. Moreover, the Blade is also not entitled to statutory damages, because it did not introduce evidence that it transmitted either of its written records requests "by hand delivery or certified mail," as required by R.C. 149.43(C)(1).[2]

## Conclusion

{¶ 36} Therefore, because the port authority has established that the requested investigative report is excepted from disclosure based on the attorney-client privilege and that it has provided the Blade with the other requested records, we deny the writ.

Writ denied.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

_____

Fritz Byers, for relator.

Spengler Nathanson, P.L.L., James R. Jeffery, Lisa E. Pizza, and Teresa L. Grigsby, for respondent.

_____

---

2. We deny the parties' requests for oral argument. The "parties' briefs and evidence are sufficient to resolve the issues raised in this case." *State ex rel. Allen v. Warren Cty. Bd. of Elections*, 115 Ohio St.3d 186, 2007-Ohio-4752, 874 N.E.2d 507, ¶ 21.