[Cite as *Sherwin-Williams Co. v. Rice*, 2012-Ohio-809.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No.   96927

---

## THE SHERWIN-WILLIAMS COMPANY

### PLAINTIFF-APPELLEE

vs.

## MOTLEY RICE LLC, ET AL.

### DEFENDANTS-APPELLANTS

---

## JUDGMENT:
## AFFIRMED IN PART, REVERSED IN PART,
## AND REMANDED

---

Civil Appeal from the
Cuyahoga County Common Pleas Court
Case No.   CV-689237

**BEFORE:**    Boyle, P.J., Sweeney, J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:**    March 1, 2012

**ATTORNEYS FOR APPELLANTS**

Michael J. O'Shea
O'Shea & Associates Co., LPA
Beachcliff Market Square
19300 Detroit Road, Suite 202
Rocky River, Ohio    44116

Luis M. Alcalde
Robert G. Cohen
Robert G. Schuler
Kegler, Brown, Hill & Ritter Co., LPA
65 East State Street
Suite 1800
Columbus, Ohio    43215

**ATTORNEYS FOR APPELLEES**

**For The Sherwin-Williams Company**

James R. Wooley
Gregory V. Jolivette, Jr.
Amanda R. Parker
Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio    44114

**For Stephen Walker**

Brendan Delay
24500 Center Ridge Road
Suite 175
Westlake, Ohio    44145

MARY J. BOYLE, P.J.:

{¶1} Defendant-appellant, Motley Rice LLC ("Motley Rice"), appeals an interlocutory order granting plaintiff-appellee's, The Sherwin-Williams Company's ("Sherwin-Williams"), motion to compel and ordering Motley Rice to produce various documents and communications to Sherwin-Williams. Motley Rice raises four assignments of error for our review:

{¶2} "[1.] The trial court incorrectly construed the scope of the attorney-client privilege.

{¶3} "[2.] The trial court incorrectly held that Motley Rice's internal communications regarding meetings and communications with potential witnesses and regarding filings with the court in pending litigation were not protected by the attorney-client privilege.

{¶4} "[3.] The trial court abused its discretion by holding that the plaintiff had demonstrated 'good cause' for the production of attorney opinion work product information.

{¶5} "[4.] The trial court abused its discretion by ordering the production of information subject to the work product doctrine without considering an in camera inspection of such materials in advance of ruling."

{¶6} Finding merit to the fourth assignment of error, we affirm in part, reverse in part, and remand for the trial court to conduct an in camera review.

Procedural History and Factual Background

{¶7}  In 1999, the state of Rhode Island, represented by Motley Rice, sued several paint manufacturers, including Sherwin-Williams, alleging that they created a public nuisance by selling lead-based paints that poisoned thousands of children in the state.  Rhode Island sought to have the lead-paint manufacturers remediate lead paint wherever it was found.  In February 2006, a jury found that three paint manufacturers, including Sherwin-Williams, created a public nuisance by making lead-based paints that did in fact poison thousands of children in the state.

{¶8}  But in 2008, the Rhode Island Supreme Court reversed the jury's verdict, concluding that the action should have been dismissed at the outset.  After the Supreme Court's ruling, Sherwin-Williams moved the Rhode Island lower court to recover its costs.

{¶9}  Relevant to this appeal, Motley Rice opposed Sherwin-Williams' motion for costs, attaching to it a single-page document (this exhibit was referred to as "Exhibit 16" in the Rhode Island case) containing three PowerPoint slides regarding information about Sherwin-Williams' defense costs in lead-paint litigation and possible insurance coverage available to the company.  Sherwin-Williams immediately sought to have the document sealed, contending that it was confidential and protected by the attorney-client privilege.  Sherwin-Williams further demanded discovery regarding Motley Rice's receipt of the document.  The Rhode Island court ultimately ruled that the document

was not protected by the attorney-client privilege because it found that the Sherwin-Williams' attorney who created Exhibit 16 "was imparting factual and business information, rather than serving as a lawyer when he prepared * * * the slides depicted on Exhibit 16." As such, the court did not permit Sherwin-Williams to discover Motley Rice's receipt of the document. The Rhode Island court further determined that the remaining 33 pages of the fax contained innocuous information and was not privileged.

{¶10} In April 2009, Sherwin-Williams filed the present action in the Cuyahoga County Court of Common Pleas against Motley Rice and Stephen Walker (a former Sherwin-Williams' employee who contacted Motley Rice concerning the lead-paint litigation in Rhode Island), asserting claims of conversion, replevin, aiding and abetting tortious conduct, misappropriation of trade secrets, and civil conspiracy. Sherwin-Williams brought an additional claim against Motley Rice for tortious interference with business relations between Sherwin-Williams and Walker. And it asserted additional claims against Walker for breach of contract and fraudulent inducement (for falsely representing that he had never disclosed confidential information in connection with a 2007 settlement of an employment law claim).

{¶11} In its complaint, Sherwin-Williams alleged that

[w]ithout the knowledge or consent of Sherwin-Williams, Motley Rice has obtained stolen copies of eighty PowerPoint slides and other confidential material used by Sherwin-Williams' General Counsel, Associate General Counsels for Litigation and Complex Litigation, and Vice President for Corporate Communications and Public Affairs to advise the Company's Board of Directors.

{¶12} Sherwin-Williams further alleged that the PowerPoint slides contained privileged attorney-client communications and attorney work product, that Motley Rice refused to reveal how it obtained the documents, and that it refused to return the documents to Sherwin-Williams.

{¶13} With respect to Steven Walker, Sherwin-Williams alleged that he worked for Sherwin-Williams from 1995 to 2005.   As part of his employment, Walker assisted Sherwin-Williams' officers, attorneys, and executives with technical and design aspects related to presentations presented to the board of directors, and therefore had access to confidential PowerPoint presentations.   Sherwin-Williams alleged that during the lead-paint litigation, Walker met with a Motley Rice attorney and provided her with Sherwin-Williams' confidential, proprietary, and privileged information.

{¶14} Motley Rice filed a counterclaim against Sherwin-Williams, alleging that Sherwin-Williams "perverted these proceedings in an attempt to accomplish an ulterior purpose."   Motley Rice claims that Sherwin-Williams continues to press this litigation, despite the fact that (a) the documents at issue are not protected by attorney-client privilege or work-product doctrine and are not proprietary, confidential, or trade secrets; (b) Sherwin-Williams already tried unsuccessfully to obtain a legal remedy from the Rhode Island court relating to the same 34 pages of documents at issue in this case; (c) the copies of the 34 pages of documents that Motley Rice had have been sealed with this court; and (d) there is no credible claim that Sherwin-Williams has been damaged in any

way. Motley Rice contends that Sherwin-Williams' "real purpose" is, among other things, to retaliate against Motley Rice for instituting lead-paint litigation against Sherwin-Williams and to force Motley Rice to expend legal fees and related costs to defend this litigation.

{¶15} The single-page document used by Motley Rice in its opposition brief to Sherwin-Williams' motion for costs in Rhode Island — Exhibit 16 — was page 9 of the 34-page fax Motley Rice received in September 2006 — while the case was pending appeal to the Rhode Island Supreme Court. Thirteen days after Sherwin-Williams filed this case in Cuyahoga County, Motley Rice agreed to deposit under seal the entire 34-page fax and all copies (which it did on April 16, 2009).

{¶16} In July 2009, Sherwin-Williams re-served its first request for production of documents on Motley Rice. Motley Rice objected to the following requests for production:

(1) all documents "showing, memorializing, describing, or relating to the circumstances regarding how Motley Rice or the State came into possession, custody, and control of Sherwin-Williams' documents";

(2) "all communications and records of communications concerning the acquisition, retention, possession or use by Motley Rice" of Sherwin-Williams' documents;

(3) "[a]ll records concerning the dissemination, distribution, disclosure, transfer, or sharing by Motley Rice" of Sherwin-Williams' documents;

(4) "[a]ll documents showing the names and addresses of every person or entity that has transferred, disclosed, shown, given, or communicated Sherwin-Williams' documents to any person or entity other than Sherwin-Williams";

(5) "[a]ll documents showing the name and address of every person employed by Motley Rice or the State who has received, obtained, possessed, or seen Sherwin-Williams' documents";

(6) "[a]ll records concerning meetings, telephone calls, email, or other communications by Motley Rice or the State with any former or current employee, director, officer, attorney, representative, or agent of Sherwin-Williams concerning in whole or in part Sherwin-Williams' documents"; and

(7) "[a]ll records showing, memorializing, describing, or relating to the reasons for Motley Rice's decision not to * * * inform Sherwin-Williams before September 28, 2008 of its receipt and possession of Sherwin-Williams' documents[.]"

**{¶17}** Despite the fact that Motley Rice deposited the 34-page fax under seal in April 2009, Sherwin-Williams alleged (in its first amended complaint filed in October 2009) that Motley Rice still refused to "explain how it came into possession of Sherwin-Williams' Documents and the Fax," or "identify and return all of Sherwin-Williams' Documents."

**{¶18}** In May 2010, the trial court ordered Motley Rice

> to make [attorneys] Fidelma Fitzpatrick and Aileen Sprague available for deposition at a mutually convenient time to answer questions regarding what interactions and/or communications they have had with Stephen Walker, and their knowledge of Motley Rice's receipt or use of the 34 page facsimile that was previously filed under seal with this Court.

**{¶19}** In June 2010, Sherwin-Williams deposed Fidelma Fitzpatrick and Aileen Sprague, attorneys for Motley Rice who were part of the lead-paint litigation team. Fitzpatrick is a partner and Sprague is an associate at Motley Rice; Fitzpatrick is Sprague's supervisor. Fitzpatrick explained that Stephen Walker contacted her by telephone in late August or early September 2006. She said that Walker initially left her a voicemail message, stating that he was a former Sherwin-Williams' employee and that he wanted to talk to her because he had information about "illegal conduct by Sherwin-Williams" relating to the lead-paint litigation in Rhode Island. Walker and Fitzpatrick talked for the first time on September 6, 2006. Walker told her that while employed at Sherwin-Williams, he had been asked to "doctor" certain "historical Sherwin-Williams' documents, to redact or edit out references or pictures of lead or lead paint from those particular documents." Walker also told Fitzpatrick that Sherwin-Williams had "purged certain offices and locations of documents that were relevant to the Rhode Island lawsuit and had shifted those documents to either warehouses or other divisions within the company[.]" Walker told her that he could

provide her with evidence to back up his claims of Sherwin-Williams' illegal conduct. The phone call lasted 20 minutes.

**{¶20}** Fitzpatrick further testified that on September 12, 2006, she and Laura Holcomb, a paralegal for Motley Rice, received the 34-page fax anonymously from a FedEx Kinkos in Ohio. Fitzpatrick said that she assumed Walker sent the fax. After reviewing the fax, Fitzpatrick determined that the documents did not support Walker's claims and "were of little import or little relevance to whatever we were doing at the time." She put them aside because they "were of no value to us." Fitzpatrick said the fax was filed and stored somewhere at Motley Rice, but she is not the one who filed it, nor did she know where it was stored. She did, however, write an email to Jack McConnell, a partner at Motley Rice, about the fax, and probably Holcomb as well. She also said that the email still exists, but refused to produce it or testify to its contents on the advice of counsel.

**{¶21}** Fitzpatrick further testified to two short phone calls with Walker on September 14, 2006. She stated that the purpose of these calls were probably to set up a date and time for them to meet in Ohio. Jack McConnell knew about the meeting beforehand, and possibly Aileen Sprague and Neil Kelly at the Rhode Island attorney general's office. Fitzpatrick would not, however, testify as to any content of the discussions she had with McConnell, Sprague, or Kelly.

{¶22} Fitzpatrick and Holcomb met Walker at the Cleveland airport on September 20, 2006, for approximately one hour. Walker further explained to them how Sherwin-Williams hid documents in the Rhode Island litigation. Fitzpatrick told Walker that she needed proof of his allegations. She said that when she left the meeting with Walker, she fully expected him to send her evidence of his claims against Sherwin-Williams. But Fitzpatrick stated that she never received anything. At this point, Fitzpatrick decided not to do anything about Walker's allegations without any evidence to back them up. Plus, she said at this point, Rhode Island had won the trial and the case was pending appeal. Fitzpatrick said that Walker did not demand anything from her or Motley Rice, nor did Motley Rice offer Walker anything in return for information.

{¶23} Fitzpatrick further testified that other people reviewed the 34-page fax besides her and Holcomb, including Jack McConnell and possibly Neil Kelly at the Rhode Island attorney general's office. These people were also involved in discussions about the fax, and maybe Bob McConnell as well, another partner at Motley Rice who was part of the lead-paint litigation team.

{¶24} Fitzpatrick explained that she did not hear from Walker again until the summer of 2007. She said that Walker told her that he was involved in settlement talks with Sherwin-Williams regarding an employment action he had filed against the

company after he was terminated, and he called to tell her that as part of that agreement, he could no longer talk to her or anyone at Motley Rice.

**{¶25}** Fitzpatrick said that Walker did not call her again until October 2008 (this was right after Motley Rice had filed its opposition brief, which had Exhibit 16 attached to it). Walker called in an agitated state, saying that Sherwin-Williams or Jones Day "had men sent to his door who claimed to be FBI agents and attempted to intimidate him and harass him about this Exhibit 16." Fitzpatrick was not in the office at the time, so Sprague talked to Walker. Sprague testified that she just tried to calm Walker down and told him not to answer his door if they returned.

**{¶26}** The last time Fitzpatrick heard from Walker was January 2009. He called to tell her that he was being deposed about the meeting he had with Fitzpatrick and about the 34-page fax. Walker told her that he did not send the fax to her, and he would testify to that fact.

**{¶27}** Fitzpatrick further testified that she was the attorney who drafted the opposition brief to Sherwin-Williams' motion to recover its costs in the Rhode Island court in September 2008. In response to Sherwin-Williams' question as to who remembered the 34-page fax when preparing the brief two year later, Fitzpatrick testified that she could not recall. Nor could Fitzpatrick recall who made the decision to use page nine of the 34 pages. Instead, she said the use of it was a team effort between Motley Rice attorneys and attorneys at the Rhode Island attorney general's office.

**{¶28}** Sprague testified to the events as Fitzpatrick had, but to a much lesser extent as she was not involved with Walker or the 34-page fax as much as Fitzpatrick was. Sprague did not even know about the 34-page fax until October 2008 when she talked to Walker (who was in an agitated state) because Fitzpatrick was out of the office.

**{¶29}** In July 2010, Sherwin-Williams filed a motion to compel Motley Rice's responses to written discovery and deposition questions.[1] Sherwin-Williams asserted that Motley Rice violated the trial court's order of May 2010, ordering Motley Rice to produce deponents to testify to its receipt and use of the 34-page fax. In the court's May 2010 order, the trial court had ordered Motley Rice

> to make Fidelma Fitzpatrick and Aileen Sprague available for deposition at a mutually convenient time to answer questions regarding what interactions and/or communications they have had with Stephen Walker, and their knowledge of Motley Rice's receipt or use of the 34 page facsimile that was previously filed under seal with this Court.

**{¶30}** The trial court granted Sherwin-Williams' motion to compel. First, the trial court determined that the information requested was not protected by the attorney-client privilege because it was not communications between the attorney (Motley Rice) and the client (the state of Rhode Island); it was internal communications between Motley Rice attorneys or communications between Motley Rice attorneys and its co-counsel on the case, the Rhode Island attorney general's office. The trial court

---

[1]Sherwin-Williams also filed a motion to compel discovery of communications between Stephen Walker and his attorney. But Walker is not a party to this appeal and thus, we will only discuss Sherwin-Williams' motion to compel discovery of Motley Rice.

then determined that the information requested was protected by the work-product doctrine, but held that Sherwin-Williams demonstrated "good cause" for disclosure of Motley Rice's claimed work product because it was relevant to Motley Rice's alleged tortious conduct and was in Motley Rice's control and otherwise unavailable. The trial court explained that "Motley Rice is not simply a law firm trying to prevent an opposing attorney from rooting through its case file, but an alleged tortfeasor that Sherwin-Williams claims should be held to account in civil damages for its conduct."

**{¶31}** Regarding testimony, the trial court ordered Motley Rice witnesses to answer all deposition questions as to how they came to possess or know any part of the 34-page packet, where they kept it, where they took it, with whom they discussed it, and the substance of such discussion. With respect to documents, the trial court ordered that Motley Rice must produce for an in camera inspection all documents listed on its privilege log that contain communications between Motley Rice and its client, the state of Rhode Island. The trial court explicitly held that ruling did not apply to communications with the Rhode Island attorney general's office because those communications were not communications between an attorney and a client and were not protected by the attorney-client privilege.

**{¶32}** The trial court further ordered that "other documents that are responsive to the discovery requests, including Motley Rice's intra-office communications about the documents at issue and communications with co-counsel Rhode Island's attorney

general" are to be "produced to the plaintiff without an in camera inspection, since they are not communications between a client and an attorney."

**{¶33}** It is from this judgment that Motley Rice appeals, raising the four assignments of error that we set forth previously.

## Standard of Review

**{¶34}** This court reviews the assertion of an alleged privilege de novo. *Ward v. Health Sys.*, 128 Ohio St.3d 212, 2010-Ohio-6275, 943 N.E.2d 514, ¶13; *Sutton v. Stevens Painton Corp.*, 193 Ohio App.3d 68, 2011-Ohio-841, 951 N.E.2d 91,¶12 (8th Dist.). Regarding work product, however, the Ohio Supreme Court also has explained that "the determination of whether materials are protected by the work-product doctrine and the determination of 'good cause' under Civ.R. 26(B)(3), are 'discretionary determinations to be made by the trial court.'" *Sutton* at ¶12, quoting *State ex rel. Greater Cleveland Regional Transit Auth. v. Guzzo*, 6 Ohio St.3d 270, 271, 452 N.E.2d 1314 (1983). Discretionary decisions are reviewed under an abuse of discretion standard of review. *Id.*

## Attorney-Client Privilege

**{¶35}** Motley Rice argues in its first two assignments of error that the trial court erred when it determined that the communications and documents sought by Sherwin-Williams were not protected by the attorney-client privilege. As such, we will

address them together under the purview of a de novo review, with no deference to the trial court's decision.

{¶36} In *State ex rel. Toledo Blade Co. v. Toledo-Lucas Cty. Port Auth.*, 121 Ohio St.3d 537, 2009-Ohio-1767, 905 N.E.2d 1221, ¶ 21, the Ohio Supreme Court explained:

> "The attorney-client privilege is one of the oldest recognized privileges for confidential communications." *Swidler & Berlin v. United States* (1998), 524 U.S. 399, 403, 118 S.Ct. 2081, 141 L.Ed.2d 379. "The privilege is intended to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'" Id. at 403, 118 S.Ct. 2081, 141 L.Ed.2d 379, quoting *Upjohn Co. v. United States* (1981), 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584. "In modern law, the privilege is founded on the premise that confidences shared in the attorney-client relationship are to remain confidential." *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 660, 635 N.E.2d 331.

{¶37} Evid.R. 501 provides that "[t]he privilege of a witness, person, state or political subdivision thereof shall be governed by statute enacted by the General Assembly or by principles of common law as interpreted by the courts of this state in the light of reason and experience." Thus, "[i]n Ohio, the attorney-client privilege is governed by statute, R.C. 2317.02(A), and in cases that are not addressed in R.C. 2317.02(A), by common law." *State ex rel. Leslie v. Ohio House Fin. Agency*, 105 Ohio St.3d 261, 2005-Ohio-1508, 824 N.E.2d 990, ¶ 18.

{¶38} Barring certain exceptions, R.C. 2317.02(A) provides that "[t]he following persons shall not testify in certain respects: An attorney, concerning a communication made to the attorney by a client in that relation or the attorney's advice to a client[.]"

{¶39} "R.C. 2317.02(A), by its very terms, is a mere testimonial privilege precluding an attorney from testifying about confidential communications." *Toledo Blade* at ¶ 24, quoting *Leslie* at ¶ 18. "The common-law attorney-client privilege, however, reaches far beyond a proscription against testimonial speech. The privilege protects against any dissemination of information obtained in the confidential relationship." (Internal quotations omitted.) *Id.* at ¶ 24.

{¶40} Motley Rice argues that the trial court erred in holding that the attorney-client privilege did not protect "internal law firm communications regarding factual investigation, witnesses, and filings in pending litigation." Motley Rice contends that the trial court incorrectly interpreted the Ohio Supreme Court's decision in *Toledo Blade* regarding Ohio's common law attorney-client privilege. Motley Rice quotes extensively from *Toledo Blade*, claiming that it is directly on point here and stands for its proposition that an attorney's factual investigations are protected by the attorney-client privilege.

{¶41} But we find *Toledo Blade* to be inapplicable to this case. In *Toledo Blade*, a newspaper sought production of an investigative report prepared by an attorney who had been retained by the Toledo-Lucas Port Authority to investigate allegations of wrongdoing by a public employee. The newspaper filed a writ of mandamus action to obtain the report.

{¶42} The Ohio Supreme Court denied the writ on the basis that the report was protected by the attorney-client privilege. The high court concluded that the investigative report prepared by the attorney was a "communication" that was incident to or related to legal advice that the attorney would give the port authority concerning alleged illegal conduct by one of the port authority's employees. Although the "communication" necessarily included facts as part of the investigation, it also reflected the attorney's professional skills and judgment regarding the port authority's legal options. *Id.* at ¶ 31. The Supreme Court concluded that the "port authority has established that the investigative report was related to [the attorney's] rendition of legal services and is thus excepted from disclosure under the Public Records Act as material covered by the attorney-client privilege." *Id.* The Supreme Court went on to explain that "[t]his holding 'furthers the laudatory objectives of the privilege: complete and candid communication between attorneys and clients.'" *Id.*, quoting *Leslie*, 105 Ohio St.3d 261, 2005-Ohio-1508, 824 N.E.2d, ¶ 43. The evidence in *Toledo Blade* established that the port authority staff members knew the investigator was an attorney, and therefore "they felt free to speak openly and candidly and with the understanding that their comments and the investigation were serious legal matters that could carry serious legal consequences." *Id.* at ¶ 33.

{¶43} In *Toledo Blade*, the attorney was hired to conduct the investigation. As part of the investigation, the attorney necessarily had to interview the staff at the port

authority. The report prepared by the attorney included communications from the staff of the port authority — and thus, the attorney-client privilege served the long-standing principle of the policy behind it — to protect client secrets and allow candid communications with the attorney. As we reiterated in *Sutton*, 193 Ohio App.3d 68, 2011-Ohio-841, 951 N.E.2d 91, ¶ 16, "[t]he attorney-client privilege is founded on the premise that confidences shared in the attorney-client relationship are to remain confidential."

{¶44} Here, however, the "communications" and documents that Motley Rice seeks to shield from discovery are not communications between a client and an attorney. They are internal communications between attorneys at Motley Rice and communications between Motley Rice attorneys and attorneys at the Rhode Island attorney general's office — Motley Rice's co-counsel on the case — regarding a 34-page document it received from a third party.[2] There is no communication by a client — or advice to a client. There are no client confidences here to be concerned about that were shared with attorneys.

{¶45} Accordingly, Motley Rice's first and second assignments of error are overruled.

---

[2]Rhode Island General Laws Section 42-9-6 provides that the attorney general shall prosecute all suits that the officers of the state (including the governor) are authorized to commence. The lead-paint action was commenced by Rhode Island, represented by the attorney general, with Motley Rice as co-counsel.

Work-Product Doctrine

{¶46} Motley Rice argues in its third assignment of error that the trial court erred in determining that "good cause" existed for the court to order it to produce its work product. And in its fourth assignment of error, Motley Rice contends that the trial court erred in ordering it to produce such work product without first conducting an in camera review. We will address these assignments of error together under an abuse of discretion standard.

{¶47} In *Squire Sanders & Dempsey v. Givaudan Flavors Corp.*, 127 Ohio St.3d 161, 2010-Ohio-4469, 937 N.E.2d 533, ¶ 54, the Ohio Supreme Court explained the history of the work-product doctrine:

The work-product doctrine emanates from *Hickman v. Taylor* (1947), 329 U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed. 451, in which the Supreme Court of the United States recognized that "[p]roper preparation of a client's case demands that [the attorney] assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. * * * This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways — aptly though roughly termed by the Circuit Court of Appeals in this case (153 F.2d 212, 223) as the 'Work product of the lawyer.' Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served."

{¶48} The privilege, however, is not absolute. *Id.* at ¶ 55, citing *United States v. Nobles*, 422 U.S. 225, 238-239, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). It is "an intensely practical one, grounded

in the realities of litigation in our adversary system," and "provides a qualified privilege protecting the attorney's mental processes in preparation of litigation, establishing 'a zone of privacy in which lawyers can analyze and prepare their client's case free from scrutiny or interference by an adversary.'" *Id.*, quoting *Hobley v. Burge*, 433 F.3d 946, 949 (7th Cir.2006).

{¶49} In Ohio, the work-product doctrine is set forth in Civ.R. 26(B)(3). This rule provides in relevant part:

> a party may obtain discovery of documents, electronically stored information and tangible things prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing of good cause therefor.

{¶50} The Ohio Supreme Court examined the meaning of "good cause" in *Jackson v. Greger*, 110 Ohio St.3d 488, 2006-Ohio-4968, 854 N.E.2d 487. It stated that "a showing of good cause under Civ.R. 26(B)(3) requires demonstration of need for the materials — i.e., a showing that the materials, or the information they contain, are relevant and otherwise unavailable." The court further described that the purpose of the work-product rule is to protect "the right of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of such cases" and "to prevent an attorney from taking undue advantage of his adversary's industry or efforts." *Id.* at ¶ 16, citing Civ.R. 26(A). "To that end, Civ.R. 26(B)(3) places a burden on the

party seeking discovery to demonstrate good cause for the sought-after materials." *Id.* at ¶ 16.

**{¶51}** While the protections for attorney work product provided in Civ.R. 26(B)(3) expressly apply to "documents, electronically stored information and tangible things prepared in anticipation of litigation," protection also extends to intangible work product. *Hickman*, 329 U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed. 451; 8 Wright, Miller, Kane & Marcus, *Fed. Practice and Procedure*, Section 2024 (3d Ed.2009). The protection for intangible work product exists because "[o]therwise, attorneys' files would be protected from discovery, but attorneys themselves would have no work product objection to depositions." *In re Seagate Technology, L.L.C.*, 497 F.3d 1360, 1376 (Fed.Cir.2007).

**{¶52}** Here, the trial court found that Sherwin-Williams met its burden of establishing that "good cause" existed to order production of Motley Rice's work product. The trial court first determined that the work product was relevant to establishing Sherwin-Williams' claims and then determined that the information was otherwise unavailable. But this court cannot determine how the trial court found that "good cause" existed without conducting an in camera review. While it is true that the information is "otherwise unavailable," it is not as certain that it is relevant without actually viewing the information.

**{¶53}** Motley Rice immediately deposited the 34-page fax under seal in April 2009, almost immediately after Sherwin-Williams filed this case. Motley Rice has already identified all of the Sherwin-Williams' documents that it had copies of in the Rhode Island litigation. Motley Rice has testified extensively as to how it obtained, received, and used page nine of the 34-page fax. Motley Rice has also testified extensively regarding all communications and meetings that it had with Stephen Walker. Finally, Motley Rice testified as to who knew about the 34-page fax and who discussed it. All of this information was requested — and received — by Sherwin-Williams. This court is perplexed as to the relevancy and need for anything else.

**{¶54}** Sherwin-Williams asserts that this case is exactly on point with this court's decision in *Sutton*. Sherwin-Williams states that in *Sutton*:

> * * * this court affirmed the trial court's order compelling disclosure of attorney work-product documents, finding that the plaintiff had demonstrated "good cause." This court reasoned that the plaintiff was entitled to discover the underlying facts and circumstances surrounding Thompson Hine's role in engaging and directing the private investigation firm to conduct surveillance of the plaintiff, because the information sought was directly at issue in the case, was necessary to establish the plaintiff's claim based on Thompson-Hine's alleged tortious conduct, and was only in Thompson Hine's possession. (Citations to *Sutton* omitted.)

**{¶55}** But notably, in *Sutton*, the trial court ordered the production of various documents *following an in camera inspection*. *Id.* at ¶ 1. This court was also able to independently review the documents as they were included under seal as part of the

appellate record. *See id.* at ¶ 29, 31. Here, the trial court never viewed the documents or communications, thus they are not part of the record before us.

{¶56} Further, courts have held that "if requested discovery is arguably either opinion work product or ordinary fact work product, the trial court should conduct an evidentiary hearing and an in camera inspection to determine which portions of a file are privileged." *Stegman v. Nickels*, 6th Dist. No. E-05-069, 2006-Ohio-4918, 2006 WL 2709405, ¶ 16, citing *Peyko v. Frederick*, 25 Ohio St.3d 164, 167, 495 N.E.2d 918 (1986); *Miller v. Bassett*, 8th Dist. No. 86938, 2006-Ohio-3590, 2006 WL 1934788, ¶ 16. Absent such hearing or inspection, any blanket grant of discovery is an abuse of discretion. *Miller*, *supra*.

{¶57} This court cannot determine the answer to Motley Rice's third assignment of error as it not ripe for review because the trial court did not conduct an in camera review. But we sustain Motley Rice's fourth assignment of error.

{¶58} The trial court is ordered to conduct an in camera review of the documents and communications listed on Motley Rice's privilege log, as well as Motley Rice's answers to Sherwin-Williams' request for production of documents. We further order the trial court to conduct an in camera review of Fidelma Fitzpatrick's and Aileen Sprague's written answers to Sherwin-Williams' deposition questions. It should not be difficult for Sherwin-Williams to prepare such written deposition questions for Fitzpatrick and Sprague, as Sherwin-Williams already documented and listed a complete

list of questions to which Motley Rice objected and refused to answer on the basis of privilege (Exhibit 1 attached to Sherwin-Williams' July 22, 2010 motion to compel).

**{¶59}** Accordingly, we affirm the trial court's judgment with respect to its finding that the information sought was not protected by the attorney-client privilege. We reverse the trial court's decision, however, with respect to whether "good cause" exists to compel production of Motley Rice's work product. Judgment affirmed in part, reversed in part, and remanded to the lower court for further proceedings consistent with this opinion.

It is ordered that appellees and appellants share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, PRESIDING JUDGE

JAMES J. SWEENEY, J., and
SEAN C. GALLAGHER, J., CONCUR