[Cite as *Vandercar, L.L.C. v. Port of Greater Cincinnati Dev. Auth.*, 2022-Ohio-3148.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| VANDERCAR, LLC, | : | APPEAL NOS. C-210643 |
| | | C-210665 |
| Plaintiff-Appellee/Cross-Appellant, | : | C-220130 |
| | | TRIAL NO. A-200900 |
| | : | |
| vs. | | |
| | : | *O P I N I O N.* |
| THE PORT OF GREATER CINCINNATI DEVELOPMENT AUTHORITY, | : | |
| | : | |
| Defendant-Appellant/Cross-Appellee. | : | |
| | : | |


Civil Appeals From:  Hamilton County Court of Common Pleas

Judgments Appealed From Are:  Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: September 9, 2022


*Taft Stettinius & Hollister LLP*, *W. Stuart Dornette*, *Russell S. Sayre* and *Beth A. Bryan*, for Plaintiff-Appellee/Cross-Appellant,

*Calfee, Halter & Griswold LLP*, *Mitchell G. Blair*, *Matthew A. Chiricosta* and *David T. Bules*, for Defendant-Appellant/Cross-Appellee.

**MYERS, Presiding Judge.**

{¶1}   The deterioration of the Millennium Hotel in downtown Cincinnati had long been an obstacle to the city's efforts to attract convention business.  In 2019, Vandercar, LLC, entered into a $36 million purchase contract with the hotel's former owners in order to facilitate the redevelopment of the hotel "as a four-star (or better) convention center hotel."  Several months later, Vandercar assigned its interest in the contract to the Port of Greater Cincinnati Development Authority ("the Port") in exchange for two potential fees totaling $7.5 million.  The Port acquired the hotel property and paid Vandercar one of its potential fees, in the amount of $2.5 million.  However, although demolition on the Millennium Hotel was completed in 2022, the dust has not yet settled on the parties' dispute over the Port's obligation to pay Vandercar the second fee of $5 million.

{¶2}   Vandercar sued the Port for breach of contract and bad faith, claiming it was owed additional fees when the Port issued revenue bonds that included funds for demolition of the hotel and other activities that Vandercar claimed were for redevelopment.  The trial court granted summary judgment in Vandercar's favor on its breach-of-contract claim in the amount of $5 million, but denied its motion for prejudgment interest.   The court granted the Port's motion for partial judgment on the pleadings on Vandercar's bad-faith claim.   Both parties have appealed.

{¶3}   Because we find that the contract is clear and unambiguous in requiring the Port to pay Vandercar its $5 million fee, we affirm the trial court's grant of summary judgment in favor of Vandercar on its breach-of-contract claim.   And because prejudgment interest cannot be assessed against the Port as an arm of the state in the absence of statutory or contractual authority, we affirm the trial court's denial of Vandercar's motion for prejudgment interest.  Finally, because Vandercar's

bad-faith claim was subsumed in its breach-of-contract claim, we hold that the trial court properly dismissed the bad-faith claim as a separate, stand-alone cause of action. However, because we find that Vandercar has alleged that the Port acted in bad faith, we reverse the trial court's granting of judgment on the pleadings as to the recovery of attorney fees and remand for further proceedings.

## *Factual Background*

{¶4} On July 1, 2019, Vandercar entered into a Purchase and Sale Agreement ("the Purchase Contract") with Cincinnati S.I. Co., the owner of the Millennium Hotel, to purchase the property for $36 million. The Purchase Contract was amended on August 27, 2019, and on September 13, 2019.

{¶5} On October 4, 2019, Vandercar assigned its rights under the Purchase Contract to the Port in an Assignment and Assumption Agreement, and the parties entered into an Agreement Regarding Assignment ("the Agreement"). The Agreement provided:

THIS AGREEMENT REGARDING ASSIGNMENT (the "*Agreement*") is entered into effective as of the 4th day of October, 2019 (the "*Effective Date*"), by and between VANDERCAR, LLC, an Ohio limited liability company ("*Vandercar*"), and THE PORT OF GREATER CINCINNATI DEVELOPMENT AUTHORITY, a port authority and political subdivision and body corporate and politic duly organized and validly existing under the laws of the State of Ohio ("*Port*"), under the following circumstances:

A. Vandercar is a party to that certain Purchase and Sale Agreement with Cincinnati S.I. Co., an Ohio limited partnership ("*Seller*") dated as of July 1, 2019, as amended by that certain First Amendment to Purchase and Sale Agreement dated as of August 27, 2019, and as further amended by that Second Amendment to Purchase and Sale

3

Agreement dated as of September 13, 2019 (as so amended, and as may be further amended and/or supplemented from time to time, together, the "*Contract*"). A true, correct, and complete copy of the Contract is attached hereto as *Exhibit A* and incorporated herein.

B. Under the Contract, among other things, Vandercar has agreed to purchase, and Seller has agreed to sell, certain Real Property (as such term is defined in the Contract)[1] located in the City of Cincinnati, Hamilton County, Ohio, on which is located the Millennium Hotel Cincinnati.

C. Port wishes to acquire the Real Property in order to redevelop, or cause to be redeveloped, the Real Property for a new hotel (the "*Project*"), which such acquisition of the Real Property may be financed with the proceeds of revenue bonds issued by the Port Authority (the "*Property Acquisition Bonds*"), and such redevelopment will be financed with the proceeds of revenue bonds issued by the Port Authority (the "*Redevelopment Bonds*"). The Property Acquisition Bonds and the Redevelopment Bonds may be issued at the same time as part of one issuance of bonds or, alternatively, may be issued on separate dates as determined by the Port.

{¶6} After setting forth certain obligations of the parties, the Agreement provided for certain payments to Vandercar. One of these was to occur upon the closing of the property ("Development Fee"), and another was to be paid upon the issuance of Redevelopment Bonds ("Redevelopment Fee"). Specifically, the Agreement provided in relevant part:

---

[1] The "Real Property" referred to in the Agreement was defined in the July 1, 2019 Purchase Contract to include the Land and Improvements at the Millennium Hotel site.

4

D. Port desires to assume Vandercar's rights and obligations under the Contract, and Vandercar desires to assign such rights and obligations to Port, subject, however, to the terms, conditions, and provisions of this Agreement.

1. *Development Fee and Expenses in Connection with the Property Acquisition and the Contract.*

a. On the Closing Date of the acquisition of the Real Property, Port shall pay Vandercar:

    i.    a "Development Fee" of $2,500,000.00;

    ii.    An amount of $250,000.00 to reimburse Vandercar for its payment to the Seller of the Initial Deposit required under the Contract;

    iii.    An amount not to exceed $175,000.00 to reimburse Vandercar for the fees and expenses incurred by Vandercar in connection with the initial due diligence with respect to the Contract, such amount to be paid to be evidenced by invoices provided to the Port with sufficient detail as to the work performed; and

    iv.    An amount not to exceed $47,500.00 to reimburse Vandercar for the fees and expenses of Government Solutions in connection with the Contract.

\* \* \*

2. *Additional Vandercar Redevelopment Fee.* The Port shall use commercially reasonable efforts to issue the Redevelopment Bonds within one year from the date of the closing of the purchase of the Real Property[.] \* \* \* The Port shall not use or allow to be used any other method of financing the development of the Project unless such

5

financing causes and allows for the payment of the $5,000,000.00 redevelopment fee described below. If the closing of the Redevelopment Bonds occurs within that one-year period (as may be extend (sic) due to force majeure event), on such date of closing of the Redevelopment Bonds[,] the Port shall pay Vandercar an additional amount of $5,000,000.00.

(Emphasis sic.)

{¶7} On January 15, 2020, the Port adopted Resolution No. 2020-04 ("the January Resolution"), authorizing the issuance and sale of revenue bonds. The January Resolution provided:

WHEREAS, the Port of Greater Cincinnati Development Authority (the "Port"), * * *, authorized and empowered * * * (1) to issue revenue bonds in one or more series for the purpose of financing costs of acquiring, constructing, installing, equipping or improving "port authority facilities," as defined in Section 4582.21, Ohio Revised Code

* * *

WHEREAS, pursuant to Board Resolution No. 2019-26 adopted on September 27, 2019, the Port entered into an Agreement Regarding Assignment dated as of October 4, 2019, with Vandercar, LLC ("Vandercar"), under which the Port accepted an assignment of Vandercar's rights, interests and obligations under a Purchase and Sale Agreement dated as of July 1, 2019 (the "PSA") with Cincinnati, S.I. Co., as amended, and pursuant thereto, the Port intends to acquire and demolish[2] (i) the Millennium Hotel, Cincinnati, Hamilton County, Ohio

---

[2] We note that "acquire and demolish" does not modify the second phrase of this sentence and have interpreted the plain language to be: the Port intends (1) to acquire and demolish the Millennium Hotel and (ii) to evaluate the timing, scope and size of new convention facilities, including a new hotel. This is consistent with both parties' arguments.

6

and certain other buildings and improvements located upon the Project
Site (defined herein), and (ii) to evaluate the timing, scope and size of
the construction of new convention facilities, including a new hotel, and
an expansion of the convention center on all or a portion of the Project
Site (collectively, the "Project"); and

WHEREAS, upon advice from the Port's staff, this Board has
determined that it is necessary and proper and in the best interest of the
Port to issue revenue bonds in one or more series in the maximum
aggregate principal amount of $59,000,000 ("Bonds") in anticipation
of the issuance of additional revenue bonds to pay for the costs of the
Project[.]

{¶8} The January Resolution then authorized the issuance of the bonds. In
it, the Port agreed to use the bond proceeds to pay a portion of the Project's costs. The
Project is defined in the January Resolution as acquisition, demolition, and evaluation
of the site.

{¶9} Specifically, the January Resolution provided:

The Port will use the proceeds of the Bonds to pay a portion of the costs
of the Project and pay or reimburse related costs, to pay certain costs of
issuance of the Bonds, to make the capitalized interest deposit, if any,
and to fund a debt service fund if required by the Original Purchaser.

{¶10} On February 12, 2020, the Port adopted Resolution No. 2020-11 ("the
February Resolution") authorizing its president to enter into contracts for the
remediation, demolition, and preconstruction at the Millennium Hotel site and for the
development and construction of new convention facilities, including a convention
center hotel, at the site. The February Resolution reiterated that the revenue bonds
authorized by the January Resolution would be used to "pay the cost of acquiring the
Project Site and demolishing the Millennium Hotel and evaluating the timing, scope

7

and size of the construction of new convention facilities, including a new hotel, and an expansion of the convention center[.]"

{¶11} On February 13, 2020, the Port issued revenue bonds ("the February revenue bonds") in the amount of $52.855 million, which were titled "Port of Greater Cincinnati Development Authority Revenue Bonds, Series 2020 (Convention Center Hotel Acquisition and Demolition Project)."

{¶12} On February 14, 2020, the Port closed on its acquisition of the real property and paid Vandercar its $2.5 million Development Fee (plus expenses), pursuant to Paragraph D(4) of the Agreement.

{¶13} On February 18, 2020, Vandercar submitted an invoice to the Port for the $5 million Additional Vandercar Redevelopment Fee described in Paragraph D(5) of the Agreement. In its letter accompanying the invoice, Vandercar asserted that the February revenue bonds were issued for purposes other than simply property acquisition and were Redevelopment Bonds issued within one year of closing, which triggered the Port's obligation to pay Vandercar's Redevelopment Fee.

{¶14} On February 24, 2020, Vandercar sued the Port after it did not pay the Redevelopment Fee.

### Procedural History

{¶15} In its complaint, Vandercar alleged two causes of action: breach of contract and bad faith. Vandercar alleged that the $52.855 million February revenue bonds issued by the Port included approximately $39 million to acquire the Project site and to pay Vandercar's $2.5 million Development Fee, and the balance to begin redevelopment activities, including demolition of the Millennium Hotel. It alleged that the Port breached the Agreement when it failed to pay the $5 million Redevelopment Fee owed to Vandercar when the Port issued "Redevelopment Bonds, as defined under the Agreement," as part of the February revenue bond issuance. Vandercar also alleged that the Port acted in bad faith by refusing to pay the

8

Redevelopment Fee and by structuring the bond issue to disguise the demolition and other redevelopment activity as something other than redevelopment.

{¶16} After the Port filed its Answer, Vandercar moved for judgment on the pleadings, seeking judgment in its favor on both its breach-of-contract and bad-faith claims. Vandercar asked the court to award it $5 million in damages as well as its attorney fees. The trial court denied the motion, finding that genuine issues of material fact remained to be determined.

{¶17} The Port then moved for partial judgment on the pleadings as to Vandercar's bad-faith claim, arguing that the claim was not a legally cognizable, free-standing cause of action under Ohio law.

{¶18} Before the court ruled on the Port's motion, and following discovery, Vandercar moved for summary judgment on its breach-of-contract claim. Then the Port moved for summary judgment on both the breach-of-contract and bad-faith claims. Both parties argued that the Agreement was clear and unambiguous. Vandercar argued that it was entitled to its $5 million Redevelopment Fee because the February revenue bonds included both Property Acquisition Bonds and Redevelopment Bonds. The Port argued that the February revenue bonds consisted only of Property Acquisition Bonds, and that it was not obligated to pay the Redevelopment Fee because it did not issue Redevelopment Bonds to construct a new hotel. In addition, the Port argued that Vandercar's bad-faith claim failed as a matter of law because there was no evidence of bad faith.

{¶19} The trial court heard arguments on the Port's motion for partial judgment on the pleadings and on both motions for summary judgment. At the end of the hearing, the trial court orally announced its decision granting summary judgment in favor of Vandercar on its breach-of-contract claim and awarding Vandercar its $5 million Redevelopment Fee, denying the Port's motion for summary judgment, and granting the Port's motion for partial judgment on the pleadings as to

Vandercar's bad-faith claim. Before the court issued a judgment entry, Vandercar filed a motion for prejudgment interest.

{¶20} The trial court then issued a judgment entry disposing of the motions. In granting summary judgment in favor of Vandercar on its breach-of-contract claim, and denying summary judgment to the Port on that claim, the trial court stated:

> The Court finds that there is no disputed issue of material fact that the Port issued revenue bonds to acquire the property, and also redevelop the property by beginning demolition of the Millennium Hotel. As such, Vandercar is entitled to judgment as a matter of law on Count One of the Complaint. The $5-Million-Dollar Redevelopment Fee defined in the contract was triggered, and is owed.

{¶21} The court rejected the Port's contention that demolition of the Millennium Hotel "was paid for by issuance of Property Acquisition Bonds, which would not trigger the Redevelopment Fee." The court explained that it considered no extrinsic evidence in reaching its decision, and it found that the language in the Agreement was unambiguous. After looking to the dictionary definitions of "acquisition" and "redevelopment" to find the plain meaning of the terms used in the Agreement, the court stated:

> The Court reads acquisition to refer solely to the gaining possession of the property. The term Redevelopment would be applied to everything else after acquisition leading up to construction of a new hotel. This includes demolition of the previous building.

{¶19} In dismissing Vandercar's bad-faith claim, the court stated that, although it was clear that the parties disagreed as to whether the Redevelopment Fee was owed, "a dispute with regard to contract interpretation is not bad faith in this case."

{¶20} After the court issued its judgment entry disposing of the motions, the Port appealed in the case numbered C-210643. Vandercar filed a cross-appeal in the case numbered C-210665, but asserted that the Port's appeal was premature under App.R. 4(B)(2)(f) because Vandercar's motion for prejudgment interest remained pending in the trial court.

{¶21} This court stayed the appeals and remanded this case to the trial court to resolve the prejudgment-interest motion. The trial court denied the motion. The court found that prejudgment interest could not be levied upon the state in the absence of a statute requiring it. The court found that the Port was an arm or instrumentality of the state because it was created by, and its powers and authorities are defined by, the Revised Code. Because the court found that no statute required the imposition of prejudgment interest on an arm or instrumentality of the state, the court refused to award prejudgment interest against the Port.

{¶22} Following the trial court's denial of the motion for prejudgment interest, Vandercar filed the appeal in the case numbered C-220130.

### *The Port's Appeal*

{¶23} In two assignments of error, the Port challenges the trial court's granting of summary judgment in Vandercar's favor on the breach-of-contract claim and denying the Port's summary-judgment motion on the same claim. The Port argues that it did not breach the Agreement with Vandercar by not paying the $5 million Redevelopment Fee. According to the Port, it did not issue Redevelopment Bonds that would trigger its obligation to pay the Redevelopment Fee, because the Agreement defined "Redevelopment Bonds" as revenue bonds issued to construct a new hotel.

{¶24} We review a trial court's ruling on a motion for summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Summary judgment is appropriately granted when there exists no genuine issue of material fact, the party moving for summary judgment is entitled to judgment as a

matter of law, and the evidence, when viewed in favor of the nonmoving party, permits only one reasonable conclusion that is adverse to that party. *State ex rel. Howard v. Ferreri*, 70 Ohio St.3d 587, 589, 639 N.E.2d 1189 (1994).

**{¶25}** In interpreting a contract, our role is "to give effect to the intent of the parties to the agreement." *Motorists Mut. Ins. Co. v. Ironics, Inc.*, Slip Opinion No. 2022-Ohio-841, ¶ 8, quoting *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11. We must "examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract." *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 129 Ohio St.3d 397, 2011-Ohio-2720, 953 N.E.2d 285, ¶ 37. Contract terms that are clear and unambiguous "should be applied as written." *Sutton Bank v. Progressive Polymers, L.L.C.*, 161 Ohio St.3d 387, 2020-Ohio-5101, 163 N.E.3d 546, ¶ 18. "[C]ommon words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Id.* at ¶ 15, quoting *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph two of the syllabus.

**{¶26}** Where the terms in a contract are clear and unambiguous, courts "cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Alexander* at 246. Where terms are not defined in the contract, courts rely upon dictionary definitions of the terms to determine their plain and ordinary meaning. *Id.* at 247-248 (applying dictionary definitions of unambiguous contract terms); *Mr. Pulpstone, LLC v. Shops on 58, LLC*, 9th Dist. Lorain No. 21CA011718, 2021-Ohio-4467, ¶ 11; *Sunoco* at ¶ 38-39 (court looked to dictionary definitions of "arrangement" because the term was not defined in the parties' agreement); *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 109, 652 N.E.2d 684 (1995) (court applied *Black's Law Dictionary* definition of "employee" where the term was not defined in parties' contract).

**{¶27}** In this case, both parties assert that the Agreement's terms are clear and unambiguous, and that the Agreement contemplated two types of revenue bonds: Property Acquisition Bonds and Redevelopment Bonds. They agree that, pursuant to Paragraph D(4) of the Agreement, the Port paid Vandercar's $2.5 million Development Fee on the closing date of the acquisition of the Real Property. They disagree, however, on the meaning of the term "Redevelopment Bonds" in the Agreement and whether the February revenue bond issuance included Redevelopment Bonds.

**{¶28}** The Port argues that the February revenue bonds were solely Property Acquisition Bonds, which it issued to finance acquisition, site studies, and demolition of the old Millennium Hotel. Vandercar argues that the February revenue bonds consisted of both Property Acquisition Bonds and Redevelopment Bonds. In support of their respective positions, both parties point to Paragraph C of the Agreement, which we set forth again:

> C. Port wishes to acquire the Real Property[3] in order to redevelop, or cause to be redeveloped, the Real Property for a new hotel (the "*Project*"), which such acquisition of the Real Property may be financed with the proceeds of revenue bonds issued by the Port Authority (the "*Property Acquisition Bonds*"), and such redevelopment will be financed with the proceeds of revenue bonds issued by the Port Authority (the "*Redevelopment Bonds*"). The Property Acquisition Bonds and the Redevelopment Bonds may be issued at the same time as part of one issuance of bonds or, alternatively, may be issued on separate dates as determined by the Port.

(Emphasis sic.)

---

[3] The Real Property referred to in the Agreement was defined in the July 1, 2019 Purchase Contract to include the Land and Improvements at the Millennium Hotel site.

{¶29} The Agreement is clear and unambiguous. It provides for Property Acquisition Bonds to acquire the property and Redevelopment Bonds to redevelop the property. The only remaining question is whether demolition and site studies are part of "acquisition" or "redevelopment."

{¶30} Vandercar argues that "acquisition" means what it says, and does not include demolition. Rather, demolition and site studies are part of "redevelopment."

{¶31} The Port claims that demolition is part of acquisition, and not redevelopment. The Port contends that the only reasonable construction of "such redevelopment" in the context of the Agreement is "redevelop[ing] the Real Property for a new hotel"—the explicit antecedent in the first clause of the sentence. The Port contends that Redevelopment Bonds can only be those issued to finance "a new hotel," and do not include bonds issued for acquisition, demolition of the old hotel, or other activities that do not result directly in "a new hotel." The Port claims that nothing in Paragraph C prevented its use of Property Acquisition Bonds to finance both acquisition and what it calls "pre-development activities," such as site studies and demolition, without triggering the Redevelopment Fee.

{¶32} The Port also argues that the final sentence of Paragraph C means that the parties intended either one issuance of bonds to pay for everything from acquisition to new hotel construction, or two separate issuances of bonds in amounts sufficient to cover acquisition and construction of a new hotel, respectively. This sentence provided that "The Property Acquisition Bonds and the Redevelopment Bonds may be issued at the same time as part of one issuance of bonds or, alternatively, may be issued on separate dates as determined by the Port." However, nothing in the final sentence limits the Port to a single issuance of Redevelopment Bonds. Under the clear language of the contract, the Port could issue Property Acquisition Bonds and Redevelopment Bonds "at the same time as part of one issuance of bonds," or "on

separate dates." So, as Vandercar correctly asserts, a single bond issuance could include only Property Acquisition Bonds, only Redevelopment Bonds, or some of each.

**{¶33}** The Agreement did not define "acquisition" or "redevelopment," and defined "Property Acquisition Bonds" only as bonds issued to acquire the Real Property and "Redevelopment Bonds" as those issued for redevelopment of the Real Property. Because the Agreement did not define the terms "Property Acquisition Bonds" or "Redevelopment Bonds" beyond this general description, we turn, as the trial court did, to dictionary definitions of the terms to determine their plain and ordinary meaning. The Agreement allowed the proceeds of Property Acquisition Bonds to finance "such acquisition of the Real Property." The word "such" refers back to the opening clause's reference to the Port's wish to "acquire the Real Property." The plain and ordinary meaning of "acquisition" is "[t]he gaining of possession or control over something; esp., the act of getting land, power, money, etc." *Black's Law Dictionary* (11th Ed.2019). Thus, the Property Acquisition Bonds are limited to the acquiring of the property and nothing more.

**{¶34}** That leads us then to what is a Redevelopment Bond. The Agreement provided that the proceeds of Redevelopment Bonds were to be used to finance "such redevelopment," referring to the introductory clause "Port wishes to acquire the Real Property in order to redevelop, or cause to be redeveloped, the Real Property for a new hotel[.]" The plain and ordinary meaning of "Redevelopment" refers to "[r]ehabilitation of an urban-residential or commercial section that is subject to blight or in decline, esp. by erecting new buildings or renovating the old ones, often with public financing or tax-increment financing." *Black's Law Dictionary* (11th Ed.2019).

**{¶35}** Applying these dictionary definitions, we agree with the trial court that, as used in the Agreement, "acquisition" refers only to the Port's gaining of possession or control of the Real Property. We find that redevelopment and

rehabilitation include demolition, site studies, and the like. Thus, the revenue bonds were issued by the Port for both acquisition and redevelopment of the site.

{¶36} Our conclusion is bolstered by the Port's own description of the bonds. The issuance was described as "Convention Center Hotel Acquisition and Demolition Project." The Port itself made a distinction between "Acquisition" and "Demolition." And it also did so in the January Resolution where it used the separate terms of "acquisition" and "demolition."

{¶37} If we were to adopt the Port's position as to the meanings of "Property Acquisition Bonds" and "Redevelopment Bonds," we would effectively be rewriting the parties' agreement, which we will not do. *See Beverage Holdings, L.L.C. v. 5701 Lombardo, L.L.C.*, 159 Ohio St.3d 194, 2019-Ohio-4716, 150 N.E.3d 28, ¶ 25, quoting *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 362, 678 N.E.2d 519 (1997) ("To the extent that [one of the parties] may be dissatisfied with the purchase price that resulted from the plain language agreed to by the parties, '[i]t is not the responsibility or function of this court to rewrite the parties' contract in order to provide for a more equitable result' ").

{¶38} We hold that the trial court properly entered summary judgment in favor of Vandercar on its breach-of-contract claim (and denied summary judgment to the Port on the same claim) because no genuine issue of fact remained—under the plain meaning of the terms used in the parties' Agreement, the February revenue bonds included Redevelopment Bonds which triggered the Port's obligation to pay Vandercar's $5 million Redevelopment Fee. Therefore, we overrule the Port's first and second assignments of error.

### *Vandercar's Appeal*

{¶39} In two assignments of error, Vandercar argues that the trial court erred by granting the Port's Civ.R. 12(C) motion for judgment on the pleadings on its bad-

faith claim and by denying its motion for prejudgment interest on its award for the breach-of-contract claim.

## A. Bad-Faith Claim

{¶40} Dismissal on a Civ.R. 12(C) motion for judgment on the pleadings is proper when a court construes as true the material allegations in the complaint, along with all reasonable inferences to be drawn therefrom, and finds, beyond doubt, that the plaintiff can prove no set of facts that would entitle the plaintiff to relief. *Reister v. Gardner*, 164 Ohio St.3d 546, 2020-Ohio-5484, 174 N.E.3d 713, ¶ 17, citing *State ex rel. Midwest Pride IV, Inc. v. Pontious*, 75 Ohio St.3d 565, 570, 664 N.E.2d 931 (1996). A Civ.R. 12(C) motion permits the court to consider the complaint and the answer in deciding whether the movant is entitled to judgment as a matter of law. *State ex rel. Fire Rock, Ltd. v. Ohio Dept. of Commerce*, 163 Ohio St.3d 277, 2021-Ohio-673, 169 N.E.3d 665, ¶ 6, citing *Pontious* at 569. We review a trial court's ruling on a Civ.R. 12(C) motion for judgment on the pleadings de novo. *Reister* at ¶ 17.

{¶41} Vandercar alleged in its complaint that the Port was liable for Vandercar's attorney fees because the Port acted in bad faith by refusing to pay the Redevelopment Fee and by structuring the February revenue bonds to make it appear that they were not issued for redevelopment to avoid having to pay the fee. Vandercar pled this as a separate cause of action in its complaint.

{¶42} We address the bad-faith attorney-fee issue both as a separate cause of action and as a request to include an award of attorney fees as costs. As to the former, we affirm the trial court's determination that no separate claim exists. But as to the latter, we return the case to the trial court.

### i. Bad Faith as a Separate Claim

{¶43} Ohio recognizes that implied in every contract is a duty of good faith and fair dealing. *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, 97 N.E.3d 458, ¶ 42. However, Ohio law is clear that it does not give rise to a stand-

alone claim. "[T]he duty of good faith and fair dealing does not stand alone from the contract but is a part of it." *Great Water Capital Partners, LLC v. Down-Lite Internatl., Inc.,* 1st Dist. Hamilton Nos. C-150015 and C-150023, 2015-Ohio-4877, ¶ 14. Therefore, a breach-of-contract claim subsumes an accompanying claim for the breach of the duty of good faith and fair dealing. *Shertok v. Wallace Group Gen. Dentistry for Today, Inc.*, 1st Dist. Hamilton Nos. C-190457 and C-190464, 2020-Ohio-4369, ¶ 40. As a result, there is no independent cause of action for a breach of the duty of good faith separate from the underlying breach-of-contract claim. *Id.*

### ii. Bad Faith as Basis for Award of Attorney Fees as Costs

**{¶44}** But Vandercar does not simply claim that it is entitled to attorney fees under the doctrine of good faith and fair dealing. Rather, it relies on our decision in *SST Bearing Corp. v. Twin City Fan Cos.,* 1st Dist. Hamilton No. C-110611, 2012-Ohio-2490, which permits the recovery of attorney fees in a breach-of-contract case where a plaintiff can establish bad faith by the breaching party.

**{¶45}** Ohio courts generally follow the "American rule" with respect to attorney fees: "a prevailing party in a civil action may not recover attorney fees as part of the costs of litigation." *Wilborn v. Bank One Corp.*, 121 Ohio St.3d 546, 2009-Ohio-306, 906 N.E.2d 396, ¶ 7, citing *Nottingdale Homeowners' Assn., Inc. v. Darby*, 33 Ohio St.3d 32, 33-34, 514 N.E.2d 702 (1987), and *State ex rel. Beebe v. Cowley*, 116 Ohio St. 377, 382, 156 N.E. 214 (1927). But there are three well-recognized exceptions to this rule: (1) where a statute specifically provides that a prevailing party may recover attorney fees; (2) where the parties' contract provides for fee shifting; and (3) where there has been a finding of bad faith. *SST Bearing* at ¶ 28, citing *Keal v. Day*, 164 Ohio App.3d 21, 2005-Ohio-5551, 840 N.E.2d 1139, ¶ 5 (1st Dist.).

**{¶46}** "A party seeking attorney fees based on the bad-faith exception to the American rule 'must be the prevailing party in the litigation, and then must prove that his opponent acted in bad faith.'" *Covenant Dove Holding Co., LLC v. Mariner Health*

*Care, Inc.*, 1st Dist. Hamilton No. C-120878, 2013-Ohio-3824, ¶ 7, quoting *Strum v. Strum*, 63 Ohio St.3d 671, 675, 590 N.E.2d 1214 (1991). "Bad faith" generally implies "a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty due to ulterior motive, ill will comparable to fraud, or an actual intent to mislead or deceive another." *Id*. at ¶ 7. Although an award of attorney fees may be granted in a contract action upon a finding by the trial court of bad-faith conduct, a trial court errs by awarding attorney fees where it has made no finding of bad faith. *Id*. at ¶ 8; *Wright v. Fleming*, 1st Dist. Hamilton No. C-070121, 2008-Ohio-1435, ¶ 5. We emphasize that an award of attorney fees is generally not available in contract actions and will be warranted only in an exceptional case.

{¶47} In *SST Bearing*, we held that the trial court was within its discretion to award attorney fees in a breach-of-contract action when it made an explicit finding that the breaching party acted in bad faith. In that case, the trial court found that the buyer had used the seller's price to obtain leverage with other competitors, had tried to obtain trade-secret information from the seller, had canceled the entire contract with the seller prior to testing any of the seller's products and had canceled orders for products for which the buyer could find no fault, and refused to give the seller an opportunity to cure any potential defects. *SST Bearing*, 1st Dist. Hamilton No. C-110611, 2012-Ohio-2490, at ¶ 29.

{¶48} Thereafter, we granted the buyer's motion to certify a conflict between our decision and the decisions of two other appellate districts on the following question:

> The "American Rule" does not permit the prevailing party to recover
> attorneys[] fees in the absence of a statutory authorization. Does Ohio
> recognize an exception to the American Rule for "bad faith" breach of
> contract in absence of an award of punitive damages?

19

The buyer appealed to the Supreme Court of Ohio, which declined jurisdiction. *SST Bearing Corp. v. Twin City Fan Cos., Ltd.*, 133 Ohio St.3d 1413, 2012-Ohio-4650, 975 N.E.2d 1031. On review of the order certifying a conflict, the Supreme Court "determined that no conflict exists," and dismissed the matter. *SST Bearing Corp. v. Twin City Fan Cos., Ltd.*, 133 Ohio St.3d 1408, 2012-Ohio-4650, 975 N.E.2d 1027. The Supreme Court denied a subsequent motion for reconsideration. *SST Bearing Corp. v. Twin City Fan Cos., Ltd.*, 133 Ohio St.3d 1494, 2012-Ohio-5459, 978 N.E.2d 912.

{¶49} In examining Ohio law in a contract action where the plaintiffs' complaints included counts seeking attorney fees based on the defendant's bad-faith conduct, the United States District Court for the Southern District of Ohio explained the difference between a stand-alone claim and a recovery of attorney fees for bad-faith conduct. In *Avis Rent a Car Sys., LLC v. City of Dayton*, S.D.Ohio Nos. 3:12-cv-399 and 3:12-cv-405, 2013 U.S. Dist. LEXIS 119597, *7-8 (Aug. 22, 2013) ("*Avis I*"), the court stated:

> [I]n breach of contract cases, Ohio courts that award attorneys' fees after a showing of bad faith conduct do so as an award of costs to the prevailing party, not as an element of damages. [(citing *SST Bearing* and *Columbus Med. Equip. Co. v. Watters*, 13 Ohio App.3d 149, 468 N.E.2d 343 (10th Dist.1983)] * * * Even though the Plaintiffs have pled a separate count for attorneys' fees based on allegations of bad faith conduct, such a claim is not cognizable under Ohio law as a free-standing cause of action, as "good faith is part of a contract claim and does not stand alone." *Lakota Local Sch. Dist. v. Brickner*, 108 Ohio App.3d 637, 671 N.E.2d 578, 584 (Ohio Ct. App. 1996). Thus, the issue of whether to award attorneys' fees to Plaintiffs is entirely appropriate to award post-judgment, or even post-appeal, after a complete and final resolution of the merits of their case.

20

{¶50} The court noted that before it entered summary judgment in favor of the plaintiffs on their motions for summary judgment on their contract claims, the plaintiffs had amended their complaints to include counts seeking attorney fees, based on alleged "bad faith" conduct by the defendant. *Id.* at *3-4. Because Ohio does not recognize a stand-alone cause of action for bad faith in a contract claim, the court dismissed the bad-faith counts in the plaintiffs' complaints and ordered the plaintiffs to file postjudgment motions for attorney fees to preserve their rights to request attorney fees, should the court's summary-judgment rulings be affirmed. *Id.* at *10-11.

{¶51} Then the plaintiffs filed their motions for attorney fees, the defendant appealed the court's decision, and the Sixth Circuit Court of Appeals affirmed the decision. *See Avis Rent A Car Sys., LLC v. City of Dayton*, S.D.Ohio No. 3:12-cv-399, 2015 U.S. Dist. LEXIS 129516, *16 (Sept. 25, 2015) ("*Avis II*"). Thereafter, the district court addressed the plaintiffs' motions for attorney fees, applying Ohio law. *Id.* at *17.

{¶52} The defendant argued that the court should deny the motions for attorney fees because the Supreme Court of Ohio had never held that attorney fees are recoverable for a bad-faith breach of contract. *Id.* at *22. However, the district court "believe[d] that the Ohio Supreme Court would recognize the exception to the American Rule for attorneys' fees based on bad-faith conduct giving rise to a breach-of-contract claim" for several reasons. *Id.*

{¶53} First, the district court pointed to our decision in *SST Bearing* and other Ohio decisions affirming such awards in contract cases where no tort or punitive damages provided the basis for attorney fees. *See id.* at *25-32, citing *SST Bearing*, 1st Dist. Hamilton No. C-110611, 2012-Ohio-2490; *Dodson v. Maines*, 6th Dist. Sandusky No. S-11-012, 2012-Ohio-2548 (upholding award of attorney fees for bad-faith conduct in an unjust-enrichment action sounding in contract); *Hall v. Frantz*, 9th Dist. Summit No. 19630, 2000 Ohio App. LEXIS 2186 (May 24, 2000) (upholding

21

attorney-fee award for bad-faith conduct in an action to enforce a settlement agreement); and *LEH Properties, Inc. v. Pheasant Run Assn.*, 9th Dist. Lorain No. 10CA009780, 2011-Ohio-516 (affirming attorney-fee award for a party's bad-faith noncompliance with a settlement agreement).

**{¶54}** Second, the district court viewed as persuasive the Supreme Court of Ohio's determination that our decision in *SST Bearing* was not in conflict with decisions of other appellate districts. *Avis II* at *32-34. The court stated that the ruling "provide[d] an addition reason to believe that [the Supreme Court of Ohio] might recognize the exception to the American Rule affirmed in that case." *Id*. at *34.

**{¶55}** Finally, the district court pointed to the Supreme Court of Ohio's decision in *State ex rel. Chapnick v. East Cleveland City School Dist.*, 93 Ohio St.3d 449, 755 N.E.2d 883 (2001), which could "be read to implicitly assume that the plaintiff might have been entitled to attorneys' fees based on bad faith" where "the conduct in question occurred entirely before he filed suit." *Avis II* at *34-35.

**{¶56}** In following our prior decision in *SST Bearing*, we also agree with the district court's analysis in *Avis II*. We hold that in an exceptional case, a party may recover attorney fees if it can establish bad faith on the part of the breaching party. And the bad faith need not involve only conduct occurring during litigation. *See id*. It can involve conduct giving rise to a party's claim. *See SST Bearing,* 1st Dist. Hamilton No. C-110611, 2012-Ohio-2490, at ¶ 29; *Cleveland Fire Fighters, Local 93 of the I.A.F.F. v. City of Cleveland*, 8th Dist. Cuyahoga No. 109136, 2020-Ohio-4751, ¶ 37 (finding no abuse of discretion in trial court's denial of attorney fees upon its finding that defendant did not act in bad faith). "If a trial court makes a finding that the losing party had acted in bad faith, and if that finding is supported by the record, an award of attorney fees is warranted." *Covenant Dove*, 1st Dist. Hamilton No. C-120878, 2013-Ohio-3824, at ¶ 7. Again, we note that this will generally not be available in a breach-of-contract action.

{¶57} In this case, the trial court determined on the face of the complaint that "there is no indication of bad faith in the present action." However, taking the allegations of the complaint as true, we cannot conclude that there is no set of facts under which Vandercar could recover. We thus sustain Vandercar's first assignment of error, reverse the trial court's decision in this regard, and return this matter to the court for a determination of whether the Port acted in bad faith.

### B.  Prejudgment Interest

{¶58} In its second assignment of error, Vandercar argues that the trial court erred by denying its motion for prejudgment interest. It asserts that prejudgment interest is mandated by R.C. 1343.03(A), and that the trial court erred by finding that prejudgment interest could not be imposed upon the Port because it was an arm or instrumentality of the state.

{¶59} Generally, a party granted judgment on an underlying contract claim is entitled to prejudgment interest as a matter of law, pursuant to R.C. 1343.03(A). *Ronald J. Solomon, D.D.S., Inc. v. Davisson*, 2018-Ohio-2011, 113 N.E.3d 1003, ¶ 7 (1st Dist.). R.C. 1343.03(A) provides:

> In cases other than those provided for in sections 1343.01 and 1343.02 of the Revised Code, when money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate per annum determined pursuant to section 5703.47 of the Revised Code, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract.

**{¶60}** Nevertheless, R.C. 1343.03(A) does not require the payment of prejudgment interest by an arm or instrumentality of the state in a contract action. *See Beifuss v. Westerville Bd. of Edn.*, 37 Ohio St.3d 187, 190, 525 N.E.2d 20 (1988) (in the absence of statutory authority, a public school board cannot be held liable for prejudgment interest on damages assessed in a contract action). As the Supreme Court of Ohio explained in *Beifuss*, "[i]t is well-established that '[i]n the absence of a statute requiring it, or a promise to pay it, interest cannot be adjudged against the state for delay in the payment of money.' "4 *Id.* at 188-189, quoting *State ex rel. Parrott v. Bd. of Pub. Works*, 36 Ohio St. 409 (1881), paragraph four of the syllabus. The court held that this "interest rule" applied "to public school boards as it has been applied to the state and its agencies." *Id.* at 189.

**{¶61}** The *Beifuss* court stated that it refused "to abandon our long-standing rule in *contract* actions that, in the absence of a statute requiring it, or a promise to pay it, interest cannot be assessed against the state for delay in the payment of money." (Emphasis sic.) *Id.* at 190. The court noted that in its prior cases, "we refused to abandon the interest rule despite the fact that prejudgment interest was allowable in cases filed against the state in the Court of Claims under R.C. 2743.18." *Id.* at 190, citing *State ex rel. Home Care Pharmacy, Inc. v. Creasy*, 67 Ohio St.2d 342, 423 N.E.2d 482 (1981), and *State ex rel. Montrie Nursing Home v. Creasy*, 5 Ohio St.3d 124, 449 N.E.2d 763 (1983). In construing R.C. 1343.03(A), the court determined that the statutory provision did not "clearly express any intention of the legislature to assess prejudgment interest against a public school board in this type of action." *Id.* at fn. 1.; *State ex rel. Stacy v. Batavia Local School Dist. Bd. of Edn.*, 105 Ohio St.3d 476, 2005-Ohio-2974, 829 N.E.2d 298, ¶ 62. The court found that any expansion of a

---

4 We note that a rule that the state is not liable for prejudgment interest in a case where it has delayed payment (i.e., slow pay) makes sense due to the bureaucracy and paperwork that may be involved when the state makes payment. The cases, however, go well beyond simply delayed payments and included, as did *Beifuss*, cases where the state disclaims liability altogether.

public school board's contractual liability to allow prejudgment interest "should be created through clearly expressed legislation by the General Assembly or by the parties themselves at the bargaining table." *Id.* at 190.

**{¶62}** The court held that a public school board is an arm of the state because its duties and powers are defined extensively in R.C. Title 33 and it is "ultimately managed and controlled by the dictates of the General Assembly." *Id.* at 189, quoting *Thaxton v. Medina City Bd. of Edn.*, 21 Ohio St.3d 56, 57, 488 N.E.2d 136 (1986). The court held that a public school board was not liable for the payment of prejudgment interest on an award of back pay because there was no statute or contractual provision requiring it. *Id.* at 190.

**{¶63}** The Supreme Court has also declined to award prejudgment interest on an employee's award of back pay against a county sheriff's department. *See State ex rel. Carver v. Hull*, 70 Ohio St.3d 570, 579, 639 N.E.2d 1175 (1994). In *Carver*, the Supreme Court rejected the employee's argument that she was entitled to prejudgment interest on an award of back pay under R.C. 1343.03(A), because the provision "d[id] not specifically establish that a county can be held liable for interest on a judgment at all, much less for prejudgment interest." *Id.* at fn. 3.

**{¶64}** In *White v. Summit Cty. Dept. of Human Servs.*, 9th Dist. Summit Nos. 23740 and 23741, 2008-Ohio-176, the Ninth District followed the approach taken by the *Beifuss* court and determined that a county department of job and family services, like a public school board, is an arm of the state because it is "ultimately managed and controlled by the dictates of the General Assembly." *White* at ¶ 14, quoting *Beifuss*, 37 Ohio St.3d at 189, 525 N.E.2d 20. The court noted that the county department was created under R.C. Chapter 329, which extensively detailed the department's duties and powers. *Id.* at ¶ 13. The court held that prejudgment interest may not accrue against the department in the absence of a statute authorizing it. *Id.* at ¶ 14.

{¶65} And in *State ex rel. Mendez v. Pub. School Emp. Retirement Sys.*, 10th Dist. Franklin No. 88AP-458, 1989 Ohio App. LEXIS 1934, *10-11 (May 23, 1989), the Tenth District held that a school employees retirement board, which was a creature of statute and could act only in accordance with its enabling statutory scheme, was an instrumentality of the state. The court held that no general statute, including R.C. 1343.03, provided for interest to be ordered against the state in actions other than those brought in the Court of Claims, and therefore, prejudgment interest could not be assessed against the retirement board. *Id.* at *12-13.

{¶66} As relevant here, a port authority is a political subdivision of the state of Ohio created under R.C. Chapter 4582. *State ex rel. Toledo Blade Co. v. Toledo-Lucas Cty. Port Auth.*, 121 Ohio St.3d 537, 2009-Ohio-1767, 905 N.E.2d 1221, ¶ 11. R.C. 4582.21(A) defines a "port authority" as "a body corporate and politic created pursuant to the authority of section 4582.22 of the Revised Code." R.C. 4582.22, in turn, provides that port authorities exercise essential governmental functions of the state. That statute provides in relevant part:

> A port authority created pursuant to this section is a body corporate and politic which may sue and be sued, plead and be impleaded, and has the powers and jurisdiction enumerated in sections 4582.21 to 4582.59 of the Revised Code. The exercise by such port authority of the powers conferred upon it shall be considered to be essential governmental functions of this state, but no port authority is immune from liability by reason thereof.

R.C. 4582.22(A). A port authority's powers are detailed in R.C. 4582.31(A)(1)-(27).

{¶67} Like the public school board in *Beifuss*, the county department of human services in *White*, and the retirement board in *Mendez*, a port authority is an arm of the state because it is a creature of statute and its powers are extensively detailed by statute. Therefore, a port authority cannot be held liable for prejudgment

26

interest on damages assessed in a contract action in the absence of a statutory or contractual provision requiring it. *See Beifuss*, 37 Ohio St.3d at 188-189, 525 N.E.2d 20. And R.C. 1343.03(A), relied on by Vandercar, does not provide statutory authority to assess prejudgment interest against the state or an arm of the state in a contract action. *See Beifuss* at 190; *Mendez* at *12-13.

{**¶68**} Vandercar seizes on the last clause of the last sentence of the statutory provision in R.C. 4582.22(A)—"no port authority is immune from liability by reason of" its performance of "essential governmental functions"—and argues that "when the General Assembly created this new form of public entity, it gave port authorities governmental powers but denied them any form of sovereign immunity." (Emphasis deleted.) Contrary to Vandercar's assertion, however, the Port never claimed that it was entitled to total sovereign immunity from Vandercar's contract claim. Instead, the Port relied on the well-established interest rule, reiterated in *Beifuss*, that the state is not liable for prejudgment interest in the absence of a statute requiring it or a promise to pay it.

{**¶69**} Moreover, unlike R.C. 2743.18(A), which provides a statutory right to prejudgment interest in suits against the state brought in the Court of Claims ("[p]rejudgment interest shall be allowed with respect to any civil action on which a judgment or determination is rendered against the state"), R.C. 4582.22(A) makes no mention of prejudgment interest. As the Supreme Court held long ago, "The state is not bound by the terms of a general statute, unless it be so expressly enacted." *State ex rel. Parrott v. Bd. of Pub. Works*, 36 Ohio St. 409 (1881), paragraph three of the syllabus.

{**¶70**} Rather, like the Supreme Court's description of R.C. 1343.03(A), the cited clause from R.C. 4582.22(A) does "not clearly express any intention of the legislature to assess prejudgment interest" against an arm of the state. *See Beifuss*, 37 Ohio St.3d at 191, fn. 1, 525 N.E.2d 20. Therefore, we decline to read into the phrase

"no port authority is immune from liability by reason [of its governmental functions]" a statutory requirement to assess prejudgment interest against a port authority. *See In re Icebreaker Windpower, Inc.*, Slip Opinion No. 2022-Ohio-2742, ¶ 56 ("We may not add words to a statute to achieve a desired construction."). If the legislature intended to assess prejudgment interest against a port authority in a contract action, it could have done so.

{¶71} In the absence of statutory authority allowing prejudgment interest to be assessed against the Port in this action, or an agreement by the parties to pay it, we hold that prejudgment interest cannot be assessed against it on the contract award because it is an arm of the state. Therefore, we hold that the trial court properly denied Vandercar's motion for prejudgment interest. We overrule Vandercar's second assignment of error.

### Conclusion

{¶72} In summary, we hold that the trial court properly granted summary judgment in favor of Vandercar, and denied summary judgment in favor of the Port, on Vandercar's breach-of-contract claim. We hold that the trial court properly dismissed Vandercar's bad-faith claim as a stand-alone claim and denied its motion for prejudgment interest. We hold, however, that the trial court erred in granting judgment on the pleadings as to Vandercar's claimed entitlement to attorney fees as a result of claimed bad faith on the part of the Port. Therefore, we affirm the trial court's entry of summary judgment in favor of Vandercar on its breach-of-contract claim and its entry denying prejudgment interest. We reverse the trial court's judgment on the pleadings on Vandercar's bad-faith claim and remand the matter to the trial court for a determination of whether the Port acted in bad faith, and, if so, whether an award of attorney fees in favor of Vandercar is warranted.

Judgment accordingly.

28

**BERGERON** and **BOCK, JJ.,** concur.

Please note:

The court has recorded its own entry this date.